Preston, &c., v. Breckinridge, &c.

CASE 82—PETITION EQUITY—JANUARY 31.

## Preston, &c., v. Breckinridge, &c.

APPEAL FROM FAYETTE CIRCUIT COURT.

1. JUDICIAL SALES—DEFECTIVE TITLE.—Where a purchaser at judicial sale obtains the title which the court, by its decree, proposed to sell, he cannot claim an abatement of the purchase price because the court is not able to make him a clear title to a part of the land.

A decree for the sale of land contained this recital: " The sale shall

pass to the purchaser all the title of George Nicholas and of those claiming under him who are parties to this suit or purchasers *pendente lite.*" The purchaser claims an abatement of the purchase price because the court cannot make him a clear title to a part of the land which is, and for many years has been, held adversely, but it is not contended that, barring this adverse holding, the title would not be in George Nicholas' devisees or those parties to the suit who claimed under Nicholas or *pendente lite* purchasers. The land to which the purchasers obtained a clear title is worth much more than they agreed to give for the whole. Not long after the purchasers raised the question that a part of the land was adversely held, the plaintiffs offered in open court to have the sale set aside and the bond canceled, and to take that part of the land, the title to which was undisputed, for their debt, interest and cost, but this offer the purchasers rejected, insisting upon holding the land and having an abatement of the purchase price. *Held*—That the purchasers cannot complain, as they obtained all that the court proposed to sell them. Moreover, the offer of the plaintiffs to have the sale set aside and to take the land for their debt, which was rejected, and the fact that the land obtained by the purchasers is worth much more than they bid for the whole, constitute a strong equity in behalf of the plaintiffs.

2. SAME—CHAMPERTY.—Our statute, which provides that all sales of land held adversely shall be void, does not apply to judicial sales.

3. SAME—SALE BONDS—LIMITATION.—Where the court, at the instance of the purchasers at a judicial sale, and against the objections of the plaintiffs, ordered a stay of execution on the sale bond until an investigation as to the title to the land and the report of the commissioner thereon could be made, the time intervening between the issual of the order and the report of the commissioner should be deducted in determining whether or not the right to issue execution is barred by the fifteen years' statute of limitation.

4. SAME.—The fact that the commissioner took one bond for the aggregate amount of the purchase money when the land was sold by the decree of the court in separate parcels, did not invalidate the bond as a statutory bond, as this arrangement was preferred by the purchasers, and the court approved the bond as taken.

5. SAME—JUDGMENT.—The fact that the judgment recites that the court reserves the power of putting the purchaser in possession of the land sold adds nothing to the judgment, as the court possessed that power independently of the express reservation of it in the judgment.

6. REVIVOR—ESTOPPEL.—An administrator, the plaintiff in an action, having resigned pending the action, his successor set up by petition the resignation of his predecessor and his own appointment, and the new administrator was henceforward treated as plaintiff by the court as well as all parties to the litigation, including the purchasers at a

Preston, &c., v. Breckinridge, &c.

sale made under decree in the action, although he was not by formal order substituted by the court as plaintiff. *Held*—That the purchasers cannot now be heard to complain that he was not formally substituted as plaintiff.

WM. LINDSAY, BROWN, HUMPHREY & DAVIE FOR APPELLANTS.

1. The judicial sale of the Nicholas lands to Preston, Payne and Ewing was not of a mere unenforceable and worthless " claim " to lands; but the court offered for sale and invited bidders to buy the " lands " themselves, and expressly promised " possession " and good title to the buyer. As the court confessedly cannot give the buyers either title or possession, there is an entire failure of the consideration of the purchase bonds, and they should not be enforced. (Fishback v. Williams, 3 Bibb, 342; Carpenter v. Strader, 16 Ben. Mon., 296; Barrett v. Churchill, 18 B. Mon., 387; Miller v. Hall, 1 Bush, 232; Stresley v. Powell, 12 B. Mon., 180; Henning v. Sweeny, 4 Ky. L. Rep., 986; Bradley v. London, 7 J. J. Mar., 641; Kent's Comm., vol. 4, side page 448; Smith v. Peyton 6 Mon., 267; Rorer's Judicial Sales, secs. 100 and 427.)

2. It is immaterial whether the other tract purchased turned out to be worth more than the amounts bid for both it and the tract in controversy. The two tracts were owned by different debtors, were entirely distinct, and were advertised, sold and bid for separately, to raise distinct debts; and the fact that a bidder got a good bargain in one tract, would be no ground for making him pay for another tract which he could not get. (Fishback v. Churchill, 18 Ben. Mon., 387; Carpenter v. Strader, 16 B. Mon., 387.)

3. The lands which the purchaser is here sought to be made to pay for, were, at the time of the said judicial sale of them to Preston, in the long continued adverse possession of strangers; and, under the champerty statutes such a judicial sale of lands in adverse possession was champertous and non-enforceable. (Revised Stat., vol. 1, page 226; 4 Kent's Com., side page 448; McConnell v. Brown, 5 Mon., 478; Com. v. Abell, 6 J. J. Mar., 76; Griffith v. Houston, 7 J. J. Mar.; Meyer v. Sanders, 7 Dana, 506; Lillard v. McGee, 3 J. J. Mar., 551; Young v. McCampbell, 6 J. J. Mar., 493; Redmond v. Sanders, 2 Dana, 69; Wilhite v. Roberts, 4 Dana, 174; Kenton Furnace v. Lowder, 1 Ky L. Rep., 399; Kelly v. Broadus, 6 Ky. L. Rep., 593; Crowley v. Vaughn, 11 Bush, 517; Sale v. Crutchfield, 8 Bush.)

4. The cases relied on by our opponents as justifying judicial sales of lands in adverse possession (2 J. J. Mar., 406; 9 Ben. Mon., 240; 1 Dana, 206; 2 Dana, 325; 3 Dana, 337; 7 B. Mon., 259), were all under the temporary statute of 1828, by which all legal titles were made liable to sale under execution, " whether in actual possession or

not." (1 Morehead & Brown's Statutes, 652, sec. 35.) The heated judicial controversy between Judges Robertson and Nicholas (arising in Frizzle v. Veach, 1 Dana, 212), as to whether that statute of 1828 justified champertous judicial sales, was settled when Judge Nicholas, as one of the revisers, caused said act of 1828 to be omitted from the Revised Statutes; and when he re-adopted in the Revised Statutes the same language which, in previous statutes, had been construed as forbidding judicial sales of lands in adverse possession. (Revised Stat., vol. 1, 432; McConnell v. Brown, 5 Monroe, 480; Shepherd v. Trimble, 4 J. J. Mar., 112.)

5. The execution upon the purchaser's bond, which we seek to quash, did not issue until more than fifteen years after the maturity of the bond; and it was, therefore, barred by the statute of limitations. (Revised Statutes, vol. 2, 126; Isaacs v. Lockhart, 2 Bush, 223; Clark v. Keller, 3 Bush, 223; Lansdale v. Cox, 7 J. J. Mar., 399; Clerk v. Traut, 81 Ky., 588.) The running of the statute was not stopped by the court's order in 1868, staying proceedings on the bond until further order of the court; because Breckinridge's administrator had the right to move for that "further order of the court" at any time in the subsequent fifteen years. (Wintersmith v. Tabor, 5 Bush, 105; Turner v. Rankin, 80 Ky., 179; 79 Ky., 470; 3 Bush, 223.)

6. As the purchase bond was not "attested by the person taking the same;" and as it was not payable to the court, but to " R. J. Breckinridge, Administrator," and as the sale bond did not follow the judgment, but blends the purchase price of two distinct purchases, it is not such a bond as under the statute has the force of a judgment, and the summary process of issuing execution upon said bond was unwarranted. It could only be enforced by suit as a common law bond. (Revised Statutes, vol. 1, page 481, sec. 1; Brown v. Miller, 3 A. K, Mar., 435; Holm v. Mitchell, 7 Bush, 132; Williams v. Hall, 2 Dana, 97; 3 J. J. Mar., 378; 4 Bush, 387; 4 Bush, 606; Spradlin v. Peiratt, 12 Bush, 496; Merchie v. Gaines, 5 B. Mon., 128; Vertrees v. Sheen, 2 Met., 293.)

7. Plaintiff, R. J. Breckinridge, Administrator, was removed as administrator in January, 1868, and there was no revivor in favor of W. C. P. Breckinridge, his successor, until December, 1883. The removal of R. J. was an abatement of the suit; and as there was no revivor within one year as the Code required, the action ended, and the subsequent revivor was erroneous. (Code, sections 500, 502, 509; General Statutes, page 247, sec. 29; Hull v. Deatley, 7 Bush, 691; Williams on Executors, 900; 7 Dana, 347; 79 Ky., 593; 6 Ky. Law R., 517.) And the laches of fifteen years before reviving was also a bar (Beech v. Reynolds, 53 N. Y., 3; Pomeroy's Eq. Jur., sec. 418.)

8. There was never any such recognition of W. C. P. Breckinridge, Administrator, as being a party to the suit as would dispense with the

Preston, &c., v. Breckinridge, &c.

need of a revivor making him the plaintiff. (Smith v. Bryant, 7 J. J. Mar., 374; Peyton v. McDowell, 3 Dana, 315; Hall v. Johnson, 5 J. J. Mar., 284; Plummers v. Crane, 5 Mon., 377; Kennedy v. Meredith, 4 Mon., 412; Shepperd v. McIntire, 5 Dana, 580.)

M. C. JOHNSON, J. D. HUNT AND JOHN T. SHELBY FOR APPELLEES.

1. After confirmation of a decretal sale no defect or want of title can affect the validity of the sale or entitle the purchaser to any abatement. The doctrine of *caveat emp'or* applies. (Todd v. Dowd's Heirs, 1 Met., 384; Farmers' Bank v. Peter, 13 Bush, 594; Yocum v. Foreman, 14 Bush, 500; Taylor v. Helm, MS. Op., Oct. 16, 1883; Megowan v. Pennebaker, 3 Met., 502; Fearrons v. Gallagher, MS. Op., Oct. 15, 1885.)

2. The Statute of Limitations as to the issuing of executions upon judgments has no application to the enforcement of sale bonds having the force and effect of judgments. (Rankin v. White, 3 Bush, 545.)

But even if the statute applies to such bonds, the issuing of execution in this case was *enjoined* by an order of court, and the time covered by the injunction is not to be estimated in the application of the statute. (Gen. Stats., chap. 71, art. 4, sec. 12.)

The order of court restraining the issuing of an execution is an *injunction* as defined by the Code (Civil Code, section 298 (Old Code), and the word "injunction," as used in the statute cited above, has the meaning given it by the Code.

3. The sale to appellants was not void by reason of the laws against champerty.

When an equitable right to land has been acquired while there was no adverse possession, then the taking of adverse possession does not prevent the conveyance of the legal title pursuant to this valid equity. (Morton v. Sanders, 1 Dana, 17; Hopkins v. Paxton, 4 Dana, 37; Chiles v. Conly's Heirs, 9 Dana, 388; Cardwell v. Sprigg's Heirs, 1 B. M., 371.)

The champerty law of 1823 did not embrace and render void any judicial sales, either those under a decree of a court of chancery (Saunders' Heirs v. Groves, 2 J. J. Mar., 409; Little v. Bishop, 9 B M., 247), or by a sheriff under execution. (Frizzle v. Veach, 1 Dana, 206; Violet v. Violet, 2 Dana, 325; Dubarry v. Marshall, 3 Dana, 337; Snowden v. McKinney, 7 B. M., 259.) And while the champerty law of the Revised Statutes expressly embraces sales under execution, sales by courts of equity are left unaffected.

4. All these matters of law and fact could have been put in issue upon the question of the confirmation of the sale, and, therefore, the final decree of confirmation is a decision upon each of these facts and conclusions of law in favor of the validity of the sale, and binding now

upon all the parties. (Dawson v. Litsey, 10 Bush, 411; Freeman on Judgments, sec. 135.)

4. Before the purchasers can have a rescission they must place the appellee in *statu quo.* (Stewart v. Dougherty, 3 Dana, 480; Carneal's Heirs v. May, 2 Mar., 595; Humble's Heirs v. Hinkson's Heirs, 3 Mar., 470; Camplin v. Burton, 5 J. J. Mar., 216; Taylor v. Porter, 1 Dana, 423; Barbour v. Morris' Administrator, 6 B. M., 127.) And this can now be done only by paying the judgment against Nicholas' representatives in money.

5. The failure to attest the sale bond does not vitiate it as a statutory bond. (Hopkins v. Chambers, 7 Mon., 261; Prather v. Harlan, &c., 6 Bush, 187.)

The Code does not require sale bonds to be attested. (Civil Code, section 405 (Old Code.)

But the court had the right to order an execution to issue, even though the bond is not a statutory bond. (Leavitt v. Goggin, 11 B. M., 230.)

6. There was no necessity for revivor. A change in the office of executor or administrator, whether by the death or removal of the first executor or administrator, does not work an abatement, but only makes the suit defective—a defect which may be cured by either a supplemental or amended bill. (Story's Equity Pleading, 340-340*b*, 329; 2 Daniels' Chancery Practice, 1517-1518.)

But even if it was necessary for the new administrator to be brought in, this was technically accomplished (a) by the filing of his petition against the purchasers who were then present in court, and their recognition of his presence as a party litigant; (b) by the order of substitution made December 14, 1883, which was in ample time unless the right itself on the bond was barred. Notice of the order of substitution was not necessary. (Civil Code, sec. 20; Gen. Stats., chap. 39, art. 1, sec. 15.)

If the resignation of the first administrator were equivalent to his death in its effects, a *judgment* does not abate even by the death of the plaintiff (Morgan v. Winn, 17 B. M., 244; Venable v. Smith, 1 Duv., 195), and bonds having the force of a judgment are, in this respect, upon the same footing as judgments. (Chinn v. Harrodsburg Savings Inst., 8 Bush, 290.)

The first administrator, as between him and his successor, was entitled, notwithstanding his resignation, to collect the bonds in the absence of an objection from a proper source that some one else was the proper person to receive the money. (Williams v. Collins, 1 B. M., 61; Moreman v. Trunnell, 3 Met., 147; Jones v. Everman, 15 B. M., 633.) Therefore, the new administrator was not a *necessary* party.

The purchasers having subsequently to the filing of the new administrator's petition in 1868, treated him as an actual party to the pro-

ceedings, they are estopped to claim that he has not properly been brought into the case. (Green v. Powell, 1 Bush, 496.)

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

On the sixth day of August, 1795, John Breckinridge and George Nicholas purchased of John Lee one-half of Joseph Blackwell's land entry, which contained nineteen thousand and sixty-two and one-half acres. The half of the entry thus purchased by Breckinridge and Nicholas was surveyed, and the survey was assigned to them, upon which a patent was issued to them for nine thousand five hundred and thirty-one and one-quarter acres. Breckinridge and Nicholas agreed to pay John Lee ten pounds for each hundred acres of said land, the title to which should prove to be indisputable.

On March 1, 1798, Breckinridge sold to Nicholas and W. Beal his half of so much of said survey as was within a circle of three miles of the forge of the iron-works company on Slate creek. In consideration of this conveyance, Nicholas and Beal agreed with Breckinridge to pay to John Lee the purchase price of the land sold them by Breckinridge. There were four thousand one hundred and fifty-five and one-quarter acres of land within this circle, of which Nicholas owned three-fourths and Beal one-fourth. Outside the circle there were five thousand three hundred and seventy-six acres of land, which Breckinridge and Nicholas owned in equal parts.

Lee, Breckinridge and Nicholas having died, and no part of the purchase money having been paid, Lee's executors brought suit at law against Breckinridge's administrators for the whole purchase money of the

nine thousand five hundred and thirty-one and one-quarter acres.

On September 12, 1811, after Lee's action was commenced, Breckinridge's administrators brought their action in equity against Lee's executors, Nicholas' executors and devisees, W. Beal and others. The purposes of this action were, first, to compel Lee's executors to exhibit an indisputable title to said land; second, to compel Nicholas' executors and W. Beal and others to pay the entire purchase money for all the land within said circle; third, to compel Nicholas' executors to pay one-half of the purchase money for the five thousand three hundred and seventy-five acres lying outside of the circle, and to enforce the lien on the whole nine thousand five hundred and thirty-one and one-quarter acres for the purchase money.

Lee's executors obtained a judgment against Breckinridge's administrators for the whole of the purchase money; but it was not until 1829 that they succeeded in collecting it from them.

In 1858, Breckinridge's administrators succeeded in obtaining judgment enforcing their lien for the purchase money, which they had been compelled to pay to Lee's executors, upon the nine thousand five hundred and thirty-one and one-quarter acres of land.

Robert Wickliffe, a purchaser *pendente lite*, and Nicholas' representatives and others, appealed the case to this court. During the pendency of the appeal Robert Wickliffe died, and the case was revived in the name of his executors. This court decided the case in 1866.

It was held by this court that Breckinridge and

Nicholas, by their purchase, acquired an indisputable title to the nine thousand five hundred and thirty-one and one-quarter acres of land; that Lee retained a lien upon the nine thousand five hundred and thirty-one and one-quarter acres of land for his purchase money; that Breckinridge's administrators, having paid the whole purchase money to Lee's executors, they were entitled to be substituted to Lee's lien upon the land, except the one-half of the five thousand three hundred and seventy-six acres lying outside of the circle, which half Breckinridge did not sell to Nicholas and Beal. Therefore, the judgment of the lower court was affirmed in so far as it adjudged a lien upon all the land within the circle and decreed a sale of it for the whole purchase money of that portion of the land, and in so far as it adjudged a lien upon Nicholas' half of the five thousand three hundred and seventy-six acres lying outside of the circle. But the case was reversed upon the sole ground that the lower court should have exhausted the lien on Nicholas' half of the land lying outside of the circle before proceeding to subject other property in the hands of Nicholas' representatives to the discharge of this lien. It was also decided that Robert Wickliffe was a mere *pendente lite* purchaser, which purchase was subordinate to the rights of the administrators of Breckinridge. For a full history of the case, see Wickliffe's Executor v. Breckinridge's Heirs, 1 Bush, 427.

The circuit court, in strict accordance with the mandate of this court, on July 26, 1867, decreed a sale of all the land within the circle and one-half of that lying without the circle.

The commissioner, pursuant to the directions of the decree, on October 14, 1867, sold the land in separate parcels on a credit of twelve months. The appellants purchased the same at a sum sufficient to pay the debts, including interest and costs, against it. The appellants, on the day of their purchase, executed bond for the purchase price, which bond became due on October 14, 1868. The sale, together with the bond, was duly reported to court, and the sale was confirmed on November 2, 1867.

The appellants being satisfied with the title to all the land lying within the circle, they paid, after the maturity of the bond, the purchase money, including the interest thereon, for all the land lying within the circle. But after the confirmation of the sale, and about the time of the maturity of the bond, they filed a petition in the case, in which they alleged that the land lying outside of the circle, which was sold by the commissioner as Nicholas' moiety, was, at the time of sale and confirmation, held in adverse possession by various persons other than claimants under Nicholas, who were parties to the suit and *pendente lite* purchasers. They asked the court to put them in possession of this land before compelling them to pay the balance of the purchase money.

Several amendments, responses and orders were made between that time and the February term of court, 1884. Such of these proceedings as we deem necessary to be noticed will be noticed hereafter.

At the February term, 1884, the appellee commenced proceedings for an order to enforce payment of the sale bond, either by execution or by an order of attach-

ment. The appellants resisted the proceedings upon the ground, among others, which will be noticed hereafter, that at the time of the judgment, sale and confirmation, and for a long time before, the land outside of the circle was in the adverse possession of various persons other than *pendente lite* purchasers and claimants under Nicholas, who were parties to the suit ; that the judgment and sale as to this land were, therefore, void ; and that the sale, to the extent of this land, should be set aside and their bond canceled.

Upon the hearing of these defenses, the lower court disregarded them, and awarded execution for the unpaid balance of the purchase money. The appellants have appealed to this court.

While the parcels of land within and without the circle were sold separately, yet this was done merely for the purpose of classifying the land ; both boundaries were liable for the same debt, which were secured by the same lien ; the same persons purchased both boundaries, and executed one bond for the aggregate amount of the purchase money.

It is conceded that the land to which the appellants get a good and clear title is worth much more than the appellants agreed to give for the whole land. It also appears that the appellee, not long after the appellants raised the question as to the land in controversy being in adverse possession, offered in open court to have the sale set aside and the appellants' bond canceled, and to take that part of the land, the title to which was undisputed, for their debt, interest and costs. This offer the appellants refused, claiming that they were entitled to a specific performance of the contract of purchase as

to all the land to which they could get a good title, and to an abatement of the contract price for the portion of land to which the court could not make them a good title.

What interest in the land did the court sell? and what interest did the appellants purchase?

The judgment answers both of these questions. It says: "The sale shall pass to the purchaser all the title of George Nicholas, and of those claiming under him, who are parties to this suit or purchasers *pendente lite* in the five thousand three hundred and seventy-six acres of land, it being the moiety of said George Nicholas and of those claiming under him that is hereby sold."

It is clear that George Nicholas, at the time the suit in 1811 was commenced, had a clear title to this land, the only incumbrance thereon being Lee's lien. It is clear that at said time there was no adverse holding of this land by others than *pendente lite* purchasers. If any persons other than *pendente lite* purchasers have made an adverse entry upon the land since 1811, the time of such adverse entry does not appear. The allegations are, that, at the time of the judgment and sale, and for a long time prior thereto, such adverse holding did exist. Also, it is not contended that, barring this adverse holding, the title to said land would not be in Nicholas' devisees, or those parties to the suit who claimed under Nicholas, or *pendente lite* purchasers.

The court offered to sell, and did sell, the title of George Nicholas, and of those claiming under him who were parties to the suit and *pendente lite* purchasers. The title of these, and none other, the court

sold. It did not propose to hazard a sale of any other title. Whatever title these parties had was sold. If outside intervening interferences had ousted the title of these parties, and established a title in others, the court says by convincing implication, if not in so many words, it did not mean to sell that title. Of this unmistakable language of the court the purchasers were notified before they purchased.

As it is not shown that the title to this land had been changed into other hands so as to defeat any title that the court might make, by reason of the conduct of the persons claiming under Nicholas who were parties to the suit, or by *pendente lite* purchasers, the appellants got at the sale all that the court proposed to sell them.

Further, observe how guarded the language is; for the court limits the sale to the title of Nicholas and his devisees, and those who are parties to the suit, claiming under Nicholas and *pendente lite* purchasers, but denies itself the right to sell the title that any other persons might have acquired from Nicholas, or from other sources, thus requiring the purchaser to look out for titles or adverse interests from such other sources.

In addition to these considerations, a strong equity confronts the appellants. The land that they actually acquired by their purchase is worth much more than they agreed to give for the whole. The appellee offered to set aside the sale, cancel their bond, and take the land, the title to which was undisputed, for their debt, interest and costs. This offer the appellant rejected, and insisted on holding this land and receiving

an abatement of the purchase price for the balance of the land, thus causing a clear loss to the appellee, and leaving him without remedy, while the appellant's purchase, already enormously profitable, would be increased to the extent of thousands of dollars by receiving an abatement of the price of the disputed land.

For the foregoing considerations we cannot concur in the appellant's contention.

But it is contended that the judgment and sale, in so far as any of the land at the time was held by adverse possession, were void, as contravening the statute against champertous sales of land.

The statute of 1824 provided, in substance, that all sales of land in the adverse possession of another, whether by executed or executory contract, should be void. The Revised Statutes contained substantially the same provision, with the addition of "including sales under execution." The General Statutes contain substantially the same provision as that of the Revised Statutes.

Champerty, by the common law, consisted in a person's upholding a controversy, he having no rightful interest therein, under a contract to have a part of the property or subject in dispute  The statutes *supra*, therefore, were not merely declaratory of the common law, but they made a new and additional provision.

The statute of 1824 was silent upon the subject of execution and judicial sales. This court construed that statute as not applying to such sales. The distinction between an execution and judicial sale, the

former being a ministerial and the latter a judicial act, was doubtless well-known to the profession and the law-makers. So, when the Revised Statutes were enacted, the provision against champerty was made to "include sales under execution" but not judicial sales. So, also, the same provision is incorporated in the General Statutes.

As just intimated, the act of 1824 was intended to apply to voluntary sales—transfers of title. It was thought best for the peace and repose of society that persons should not stir up strife, contention and animosities, by selling or transferring land in the adverse possession of another. But when a person's land was sold by judicial sale, he could not be said to have sold it. Its sale might be against his will. The court ordered the sale, and the court, by its commissioner, made the sale.

The court was not required to institute a search in order to find out whether or not any other person held the adverse possession of the land. The person and his title were before the court, and the court having jurisdiction of both, and seeing that the title was in the person, and that another party before the court had the right to have the title sold, no further inquiry was necessary. (Saunders' Heirs v. Groves, 2 J. J. Mar., 408; Little v. Bishop, 9 B. Mon., 240; Drinkwater v. Drinkwater, 4 Mass., 354; Willard v. Nason, Administrator, &c., 5 Mass., 241; Cook v. Travis, 20 N. Y., 400; McGill v. Doe, 9 Ind., 306; Stevens v. Hauser, 39 N. Y., 302; High v. Nelms, 14 Ala., 350; Dubois & Longer v. Marshall, 3 Dana, 337.)

Thus stood the law down to the time of adopting

the Revised Statutes. The provision of that statute relative to champerty re-enacted the statute of 1824 upon that subject, except sales under execution were included in the Revised Statutes. Also, the General Statutes have the same provision in reference to executions.

We conclude that these two statutes were adopted with reference to the construction that had been given the act of 1824; and that the provisions in these two statutes were intended to have the same meaning as the act of 1824, as interpreted by this court, except in so far as a change was expressly made by "including sales under execution." The reason why sales under execution were excluded is readily seen when it is considered that the officer making the sale is a ministerial officer, whose duty it is to investigate for himself, not only whether the execution defendant has title to the land, but whether it is adversely held. This latter fact is not required of the chancellor. Hence, the statute does not embrace judicial sales.

It is also contended that by the failure to issue execution on the sale bond for more than fifteen years after the maturity of the bond, the right to issue the execution was barred.

This position would be well taken but for the fact that the circuit court, at its December term, 1868, at the instance of the appellants, and against the objections of the appellee, ordered a stay of execution on the sale bond until the investigation of the title to the land in dispute, and the report of the commissioner thereon, could be made. The commissioner made no report until 1871. This order, made at the instance

of the appellant, was certainly a valid and binding order, which prevented the appellee from issuing execution on the bond. And the order having been taken at the instance of the appellants, it is certainly not right for them to be allowed to take advantage of the delay caused by it, in order to escape from the payment of the bond. Deducting the time intervening between the issual of the order and the report of the commissioner, the statute of fifteen years does not apply.

Robert J. Breckinridge, at the time the judgment was rendered and the sale of the land thereunder, was the administrator of John Breckinridge; but he resigned and the appellee, W. C. P. Breckinridge, was, on the eighth day of January, 1868, appointed administrator instead of Robert J. Breckinridge. Shortly afterwards he, by petition, set up the fact of the resignation of Robert J. Breckinridge and his appointment. Robert J. Breckinridge and W. C. P. Breckinridge also presented another petition, in which they set up the foregoing facts. These petitions were filed in the case, and W. C. P. Breckinridge was, henceforward, treated as plaintiff in the case, although he was not by formal order substituted by the court as plaintiff. But the case having for years progressed in his name, and he having been treated as plaintiff in the case by both court and appellants, they, the appellants, cannot be heard to complain now. Besides, the court did, in 1883, by formal order, substitute W. C. P. Breckinridge as plaintiff in the case.

The land was sold by the decree of court in separate parcels, but the commissioner took one bond for the aggregate amount of the purchase money. This ar-

rangement was preferred by the appellants, and the court approved the bond as taken. This arrangement did not invalidate the bond as a statutory bond.

The judgment recites that the court reserves the power of putting the purchaser in possession of the land sold. It has already been indicated what title was sold, and this part of the judgment has reference to that land. Besides, the reservation of the power adds nothing to the judgment, because the court possessed the power independently of the express reservation of it in the judgment.

We find no error in the record prejudicial to the rights of the appellants.

The judgment is affirmed.